IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOYCE KAY OGLE,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| V. ) | Civil No.  **04-112-WDS** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Respondent. ) | |

### REPORT AND RECOMMENDATION

Before the Court is the sole issue remaining in the petition of Joyce Kay Ogle to vacate, set aside or correct sentence pursuant to  28 U.S.C. § 2255.  **(Doc. 1).**

Petitioner Ogle was convicted in 2001 of conspiracy to possess with intent to distribute cocaine, and was sentenced to 120 months imprisonment.  *U.S. v. Ogle***, No. 00-30176-2-WDS, Doc. 143.**  On direct appeal, her conviction was affirmed.  *Ogle,* **No. 00-30176-2-WDS, Doc. 158;** *United States v. Suggs***, 59 Fed.Appx. 818 (7th Cir. 2003).**  In February 2004 petitioner filed the subject petition for writ of habeas corpus.  **(Doc. 1).**  By order dated February 7, 2006, three of the grounds for relief were denied, and the District Court referred the single remaining issue to the undersigned magistrate judge for an evidentiary hearing and report and recommendation.  **(Doc. 10).**  That issue is whether petitioner received ineffective assistance of counsel at trial when counsel allowed testimony to come into the record without objection that had been the subject of a motion in limine (*see Ogle*, No. 00-30176-2-WDS, Doc. 59) and which the Court had ruled inadmissible unless the door was opened by petitioner. **(*See* Doc. 1, pp. 5, 10-12 ;and Doc 10, pp. 4-5 (all as numbered in the CM-ECF system)).**

In accordance with Rule 8(c) of the Rules Governing Section 2255 Proceedings for the

United States District Courts, counsel was appointed to represent petitioner at the evidentiary hearing.  **(Doc. 12).**  An evidentiary hearing was held March 2, 2007.  In accordance with 28 U.S.C. §§ 636(b)(1)(B) and (C) this report and recommendation is respectfully submitted to U.S. District Judge William D. Stiehl.

### Applicable Legal Standards

Collateral relief under 28 U.S.C. § 2255 "is available only for an error of law that is jurisdictional, constitutional, or constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" ***Carreon v. United States*, 578 F.2d 176, 179 (7th Cir. 1978) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974);** *see also* **28 U.S.C. § 2255.**

In accordance with *Strickland v. Washington*, 466 U.S. 668 (1984), in order to establish an ineffective assistance of counsel claim a petitioner must prove that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient performance prejudiced the defense.  *Id.* **at 687-688.**  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* **at 694.**  Attorney performance is not assessed in hindsight, but rather from counsel's standpoint, given the totality of the circumstances, and there is a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. **at 688-689.**  The defendant must affirmatively prove prejudice; a "conceivable effect" on the outcome isn't enough. *Id* **at 692-693.**  By the same token, a defendant does not have to show that the deficient conduct more likely than not altered the outcome. *Id* **at 693.**  According to *Strickland*, "the question is whether

there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* **at 695.** A verdict weakly supported by the record is more likely to have been effected by error than a verdict with overwhelming support in the record**. *Id*. at 696.** The Court must perform the necessary calculus to determine whether Ogle has met her burden.

### Findings of Fact

On August 15, 2000, Ogle and Assistant U.S. Attorney for the Eastern District of Missouri John J. Ware entered into a proffer agreement[1] related to possible charges in that district.  **(Government's Exhibit 7).**  The proffer agreement is contingent upon Ogle's "information and ability to develop information [being] honest, reliable and worthwhile." **(Government's Exhibit 7, p. 1).**  The agreement also contains a caveat that, if Ogle were to become "a witness at any future trials and offer testimony materially different from any statements made or other information provided during the interview," the government could cross examine her regarding statements made or other information provided during the proffer, so as to ensure that the opportunity to cooperate is not abused and perjury is not committed. **(Government's Exhibit 7, p. 2).**

Ultimately, Ogle went to trial in the Southern District of Illinois.  Ogle's proffer statement is reflected in a DEA-6 "Report of Investigation."  **(Government's Exhibit 1).** Only

---

[1] The Court previously ruled *post-trial* that there was only a proffer agreement in the Eastern District of Missouri, not a plea agreement; the agreement was not binding in the Southern District of Illinois; and Ogle had not cooperated as required under the terms of the agreement, in that she had fled the jurisdiction and lived under an assumed name. ***Ogle,* No. 00-30176-2-WDS, Doc. 138.**

two matters in the DEA-6 report are pertinent.

First, the report indicates Ogle told of a series of phone calls from co-defendant Suggs. Suggs told Ogle he had been waiting for co-defendant Ellebracht and he wondered if Ogle knew where he was– Ogle did not know Ellebracht's whereabouts. Shortly thereafter Suggs called again and asked Ogle if she could pick up Ellebracht, whose vehicle had broken down on the highway. According to the DEA-6 report, Ogle told Suggs she wanted to pick up Ellebracht, but her boyfriend (now husband), Gerald Lackey, would not let her, and they had just argued about it. **(Government's Exhibit 1, ¶ 9).** At the evidentiary hearing, Ogle argued that the report was correct up to the point that it indicated she and Lackey were arguing about her picking up Ellebracht. Ogle explained they were fighting about their finances. With respect to that point of contention, this Court finds no cause to doubt Ogle's version of events. In any event, that discrepancy is not material to the issues before the Court.

Second, the DEA-6 report reflects Ogle relating a discussion she had with co-defendant Suggs at the Royal Heights Car Wash, wherein Suggs asked Ogle if she wanted to make a few trips for him of the sort Ellebracht had been making. It is undisputed that the trips were related to Suggs' activities as a drug dealer. According to the report, Ogle informed Suggs she did not want to make the trips, but if she did, she would not let Suggs "cheat her like he did Ellebracht, by only paying him $500.00." **(Government's Exhibit 1, ¶ 11).**

Prior to trial, the Court granted Ogle's motion in limine regarding her August 2000 proffer, "depending on the testimony elicited by defendant." **(Government's Exhibits 2 and 4).** The government had agreed that the proffer would not be introduced at trial, unless Ogle contested the government's evidence or attempted to mislead the jury as to her knowledge and/or

involvement in the alleged conspiracy.  (***Ogle,*** **No. 00-30176-2-WDS, Doc. 63, p. 3)**.

      Ogle's attorney, Paul Storment, III, explained that it was his strategy to attempt to show the jury that Ogle had shunned any involvement in the drug conspiracy, tried to dissuade her friend Ellebracht from getting involved, and had been living a life that was antithetical to her joining a drug conspiracy.  Storment acknowledged that he was attempting to navigate a fine line between eliciting evidence favorable to his client and contradicting the proffer.  Ogle called Gerald Lackey as a witness at trial.  Lackey explained that he and Ogle were engaged at the time of her arrest, and that Ellebracht was a mutual friend.  **(Government's Exhibit 6, pp. 41-42).**  Lackey described Ogle as being scared, puzzled and confused by her arrest, feeling that she should not have been charged. **(Government's Exhibit 6, pp. IV-43, 46 and 47).**  Lackey testified that he also did not think Ogle should have been charged.  **(Government's Exhibit 6, p. IV-47).**  Attorney Storment's line of questioning linked Ogle's feeling that the conspiracy charge was unfair to her flight from justice.  **(Government's Exhibit 6, pp. IV-48-50).**

      The prosecutor at trial, Assistant U.S. Attorney James Porter, explained that in accordance with his reading of *United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998), Ogle "opened the door" to the introduction of her proffer statement when she presented contradictory evidence.  More specifically, Porter took issue with Ogle's use of Lackey to portray her as, essentially, a mere innocent, after she had admitted knowledge and involvement in her proffer.  Therefore, on cross examination A.U.S.A. Porter asked Lackey a series of questions to illustrate that Lackey was well aware of Ogle's involvement with drugs and the charged conspiracy.  **(Government's Exhibit 6, pp. IV-51-52).**   Porter asked Lackey if he knew Ogle had recruited Ellebracht to make trips for Suggs.  **(Government's Exhibit 6, p. IV-52).**  Suggs' attorney

objected that the question went beyond the scope of direct examination, but the objection was overruled.  **(Government's Exhibit 6, p. IV-52).**  Porter next asked Lackey if he recalled an argument with Ogle when someone called and asked her to pick up Ellebracht when his car broke down– referring to the phone call from Suggs that had been disclosed in Ogle's proffer. **(Government's Exhibit 6, p. IV-53).**  On behalf of Ogle, attorney Storment objected that the question called for "evidence not before the jury."  **(Government's Exhibit 6, p. IV-53).** Storment now explains that he hoped his phrasing would alert the judge that he was referring to the proffer and/or motion in limine, but he did not want to give the jury any indication that there was information being withheld from them, so he did not ask for a sidebar conversation with the Court.  The objection was overruled.

Similarly, A.U.S.A. Porter perceived that Ogle "opened the door" for admission of her proffer statement when Ogle's attorney was cross examining Ellebracht.  **(Government's Exhibit 5, pp. III-38- 48).**  Ellebracht had already pled guilty and was testifying on behalf of the government.  **(Government's Exhibit 5, p. II-164).**  On direct examination Ellebracht described the trip he was making for Suggs when he was arrested, and that he had been paid $500.  **(Government's Exhibit 5, p. II-167).**  He subsequently related how Ogle had told him that Suggs, their mutual drug source, wanted him to do something– "make some trips." **(Government's Exhibit 5, pp. II-177-178).**  Ellebracht then described making 25 trips for Suggs, each for a $500 fee.  **(Government's Exhibit 5, pp. II-182, 188).**

On cross examination, Suggs' attorney followed up on the origination and evolution of Ellebracht's acting as a courier for Suggs, but he did not specifically mention the link to Ogle. **(Government's Exhibit 5, pp. III-11-20).**

On cross examination, Ogle's own attorney, apparently in keeping with his aforementioned strategy, elicited testimony about how Ellebracht and Ogle had been good friends, and had bought drugs together for solely recreational purposes.  **(Government's Exhibit 5, pp. III-39-40).**  Attorney Storment confirmed with Ellebracht that Ogle had initially relayed to Ellebracht only that Suggs had asked that Ellebracht contact him.  **(Government's Exhibit 5, pp. III-40-41).**  Ogle's attorney also elicited from Ellebracht that he was surprised when Ogle answered his calls to Suggs on the night of his arrest, because he did not think Ogle "knew what was going on."  **(Government's Exhibit 5, pp. III-41-42).**  Counsel also elicited that he and Ogle had once lived together, and that Ogle had a good job and would often decline to take drugs with Ellebracht, so Ellebracht would go off with others.   **(Government's Exhibit 5, pp. III-43-44).**  Ogle's attorney returned to the issue of Ogle's involvement in connecting Suggs and Ellebracht, precipitating the $500 per trip arrangement.  Storment asked  whether Ogle had actually told Ellebracht that the trips were a "dumb idea," and discouraged Ellebracht from making them.  **(Government's Exhibit 5, p. III-46).**

On re-direct examination A.U.S.A. Porter asked Ellebracht, "[I]n fact, Joyce [Ogle], on occasion, would tell you that she wouldn't make the trips for as little money as you were making?"  **(Government's Exhibit 5, p. III-55).**  Suggs' attorney successfully objected that the question was leading and suggestive, so Porter asked, "Did Joyce Ogle ever tell that you [sic] she wouldn't make those trips for as little money as you were making on them?"   **(Government's Exhibit 5, pp. III-55-56).**  Ellebracht answered in the affirmative, and no objections were lodged.  **(Government's Exhibit 5, p. III-56).**

Attorney Storment asked if he could re-cross Ellebracht regarding Ogle's comments

about the trips, because he perceived that issue to have been newly raised.  **(Government's Exhibit 5, p. III-56).**  The Court permitted re-direct examination, noting that that topic had been "covered on direct, but it was brought out on cross."  **(Government's Exhibit 5, p. III-56).**  Defense counsel then attempted to clarify that Ogle's comment related to her discouraging Ellebracht from making the trips, noting that he was being "ripped off" because he was only paid $500, as opposed to Ogle meaning that she personally would not have made the trips for as little as $500.  **(Government's Exhibit 5, p. III-57).**  Ellebracht agreed with that more favorable construction of Ogle's comment and added that Ogle never would have thought about making such trips.  **(Government's Exhibit 5, p. III-57).**

During the evidentiary hearing, Ogle asserted that her proffer was the *only* possible source of the government's knowledge of her statements about: (1) the telephone call to pick up Ellebracht and her supposed argument with Lackey; and (2) and her comment that she never would have made the trips for only $500 and her characterization of Suggs "cheating" Ellebracht.  In contrast, the government asserted that the door was opened to the admission of both items from Ogle's proffer, and all the information elicited from Ellebracht had been previously disclosed to the government by Ellebracht, who was a cooperating witness.

The evidence supports Ogle's assertion that the DEA-6 report reflecting her proffer was the source of the government's knowledge of the telephone call from Suggs to Ogle requesting she pick up Ellebracht.  However, the evidence supports the government's contention that Ellebracht was its independent source of information regarding Ogle's statements that she would not have made the trips, nor would she have let Suggs cheat her by paying only $500 per trip. Again, neither of these disputed facts is dispositive of the issues before the Court.

## Analysis

In her petition, Ogle contends that "on at least two occasions" at trial the government introduced information that could only have been drawn from the proffer.  Only two matters purportedly drawn from the proffer are actually addressed in the petition and were raised during the March 2, 2007, evidentiary hearing:

1. A situation in which co-defendant Suggs had called while Ogle was arguing with her boyfriend Gerald Lackey and asked Ogle to pick up confessed coconspirator Ellebracht, whose car had broken down; and

2. Ogle's statement that she told co-defendant Suggs that she would not make the trips as a drug courier that Ellebracht made, nor would she let Suggs "cheat her like he did Ellebracht, by only paying him $500.00."

As a preliminary matter, this Court concludes that the two pieces of information Ogle takes issue with were not improperly utilized at trial.  As the District Court concluded post-trial, there was only a proffer agreement in the Eastern District of Missouri, not a plea agreement; the agreement was not binding in the Southern District of Illinois; and Ogle had not cooperated as required under the terms of the agreement, in that she had fled the jurisdiction and lived under an assumed name.  ***Ogle,* No. 00-30176-2-WDS, Doc. 138.**

Even if the proffer agreement were binding in the Southern District of Illinois, in accordance with *United States v. Krilich*, 159 F.3d 1020, 1024-1026 (7th Cir. 1998), Ogle waived the protection of the agreement, Federal Rule of Evidence 410, and Federal Rule of Criminal Procedure 11, by offering evidence that contradicted her proffer.  Upon direct examination by Ogle's attorney, Lackey described Ogle as being scared, puzzled and confused by her arrest,

feeling that she should not have been charged, and he did not think Ogle should have been charged. **(Government's Exhibit 6, pp. IV-43, 46 and 47).** This amounts to an affirmative effort to present the jury with evidence that contradicts her admission of any knowledge or involvement with the activities of Suggs and Ellebracht, as evidenced by the call from Suggs asking her to pick up Ellebracht.

Similarly, it was Ogle's counsel that elicited information aimed at portraying Ogle as uninvolved and/or actively against whatever it appeared Suggs and Ellebracht were doing. **(Government's Exhibit 5, pp. III-41-46).** It was Ogle's attorney who delved into whether Ogle had actually told Ellebracht that the trips were a "dumb idea," which then "opened the door" for the government to explore exactly why Ogle thought the trips were a dumb idea. **(Government's Exhibit 5, p. III-46).** Porter asked Ellebracht, "in fact, Joyce [Ogle], on occasion, would tell you that she wouldn't make the trips for as little money as you were making?" **(Government's Exhibit 5, p. III-55).** Again, it is important to note that Ellebracht was a cooperating witness and had himself revealed Ogle's statement to the government.

In both instances Ogle's attorney failed to specifically object that the government had violated the Court's order limiting the introduction of information from the proffer. Therefore, the objection was waived. Moreover, Ogle's attorney acknowledged that he concluded the benefit to Ogle's case outweighed the harm in pressing any such objection. Attorney Storment also admitted atttempting to use Lackey and Ellebracht's feelings for Ogle to portray her in a more positive light before the jury. On its face, the District Court will no doubt recognize that the defense strategy is a common one used by "lesser" members of a conspiracy. Thus, this Court finds that attorney Storment's performance– in following the aforementioned strategy, and

not specifically objecting to a possible violation of the Court's limiting order– was objectively reasonable under prevailing professional norms.

Moreover, from this Court's perspective, had the telephone call from Suggs, Ogle's comment that she would not make the trips for Suggs, and her statement that she would not be cheated like Ellebacht, not been introduced, there still would not have been reasonable doubt of Ogle's guilt.

The Court of Appeals for the Seventh Circuit included Ogle's comment about how she would not make the trips herself based on the small amount of money paid. The appellate court stated:

> In this case ample evidence supports the conclusion that Ogle and Suggs engaged in the charged conspiracy.
>
> * * *
>
> As for Ogle, Ellebracht testified that she recruited him to be a courier for Suggs and that he and Ogle had purchased crack from Suggs in the past. Ellebracht also testified that when Ogle recruited him she said that she would not risk making the trips herself based on the small amount of money Suggs was offering-thereby giving the jury reason to infer that Ogle knew the nature of the trips for which she recruited Ellebracht. The government also introduced evidence that following her arrest and before her trial Ogle was found with false identification in Texas and attempted to conceal her identity from police officers. Therefore, a rational jury had evidence from which to conclude that Suggs and Ogle each engaged in the charged conspiracy.

**U.S. v. Suggs, 59 Fed.Appx. 818, 820 (7th Cir. 2003) (unpublished opinion).**

In a subsequent appeal the appellate court recognized that Ellebracht's testimony and pretrial statements were sometimes contradictory, but explained that Ellebracht was "thoroughly questioned about the inconsistencies," and he insisted his trial testimony was true. The appellate court noted that it was the province of the jury to parse the facts and weight the credibility of

witnesses in such a situation. In any event, the appellate court again noted that there was an "overwhelming amount of evidence introduced in support of the conviction on the charged conspiracy." *U.S. v. Ogle*, **425 F.3d 471 (7th Cir. 2005).** That logic is applicable to both the telephone call from Suggs and Ogle's comments about the trips and "cheating." Ogle has simply offered no more than conjecture that she was prejudiced by the introduction of information contained in her proffer.

### Recommendation

For the aforestated reasons, it is the recommendation of this Court that the lone remaining ground for relief in Joyce Kay Ogle's petition to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 **(Doc. 1)**, ground four, be denied, and that final judgment enter accordingly.

**Submitted: March 5, 2007**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

### Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **March 22, 2007**.